RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0226p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

TAWANDA HALL, CURTIS LEE, CORETHA LEE, and KRISTINA GOVAN,

        *Plaintiffs-Appellants*,

> No. 21-1700

*v.*

ANDREW E. MEISNER, Oakland County Treasurer; OAKLAND COUNTY, MICHIGAN; SOUTHFIELD NEIGHBORHOOD REVITALIZATION INITIATIVE, LLC; CITY OF SOUTHFIELD, MICHIGAN; FREDERICK ZORN; KENSON SIVER; SUSAN P. WARD-WITKOWSKI; GERALD WITKOWSKI; IRV LOWENBERG; MITCHELL SIMON; E'TOILE LIBBETT; SOUTHFIELD NON-PROFIT HOUSING CORPORATION,

        *Defendants-Appellees*.

---

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-12230—Paul D. Borman, District Judge.

Argued: July 20, 2022

Decided and Filed: October 13, 2022

Before: KETHLEDGE, BUSH, and NALBANDIAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Christina M. Martin, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, for Appellants. John R. Fleming, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Oakland County Appellees. Michael A. Knoblock, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellees Zorn, Siver, Ward-Witkowski, Witkowski, and Lowenberg. Matthew T. Nicols, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, for Appellees Libbett, Simon, Southfield Neighborhood Revitalization Initiative, and Southfield Non-Profit Housing Corporation. **ON BRIEF:** Christina M. Martin, Kathryn D. Valois, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, Scott Smith, SMITH LAW GROUP, PLLC, Farmington Hills, Michigan, Jayson E. Blake, MCALPINE PC, Auburn

Hills, Michigan, for Appellants.  John R. Fleming, William H. Horton, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Oakland County Appellees.  Michael A. Knoblock, T. Joseph Seward, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellees Zorn, Siver, Ward-Witkowski, Witkowski, and Lowenberg.  Matthew T. Nicols, PENTIUK, COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, for Appellees Libbett, Simon, Southfield Neighborhood Revitalization Initiative, and Southfield Non-Profit Housing Corporation.  **ON OPENING BRIEF IN SUPPORT OF MOTION TO INTERVENE:** Matthew B. Hodges, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Intervenor State of Michigan.

---

## OPINION

---

KETHLEDGE, Circuit Judge.  In this case the defendant Oakland County took "absolute title" to plaintiff Tawanda Hall's home—worth close to $300,000, on the facts alleged here—to satisfy a $22,262 tax debt, and then refused to refund any of the difference.  The other plaintiffs shared a similar fate with their homes.  Under Michigan law—and the law of virtually every state for the past 200 years—a creditor can divest a debtor of real property only after a public foreclosure sale, after which any surplus proceeds in excess of debt are refunded to the debtor.  The return of that surplus compensates the debtor for her equitable interest in the property—which in common speech is called the "equity" in real property, and which English and American courts for centuries have called "equitable title."  Yet the Michigan General Property Tax Act created an exception to this rule for just a single creditor: namely, the State itself (or a county thereof), which alone among all creditors may take a landowner's equitable title without paying for it, when it collects a tax debt.  In that respect the Michigan statute is not only self-dealing: it is also an aberration from some 300 years of decisions by English and American courts, which barred precisely the action that Oakland County took here.

The government may not decline to recognize long-established interests in property as a device to take them.  That was the effect of the Michigan Act as applied to the plaintiffs here; and we agree with the plaintiffs that, on the facts alleged here, the County took their property without just compensation.  We therefore reverse the district court's dismissal of their claim against the County under the Takings Clause of the U.S. Constitution.

I.

A.

Oakland County took title to the plaintiffs' homes under the Michigan General Property Tax Act, which prescribed the process for tax foreclosures during the period relevant here. As a first step, on March 1 of each year, property taxes that remained unpaid during the preceding twelve months were "returned as delinquent for collection." M.C.L. § 211.78a(2). If taxes for a property remained unpaid by March 1 of the next year, the property was "forfeited to the county treasurer[.]" *Id*. § 211.78g(1). Forfeiture itself did "not affect title"; rather, it merely allowed the "foreclosing governmental unit" to petition for a "judgment of foreclosure" as to the property. *Rafaeli, LLC v. Oakland County*, 505 Mich. 429, 444 (2020). Yet the Act did not require counties to seek foreclosure; rather, foreclosure for a county was "voluntary." M.C.L. § 211.78(6). If a county chose not to foreclose on property, the State could do so. M.C.L. § 211.78(3)a.

If a county or the State did choose to foreclose on a forfeited property, the Act required it to file a petition to that effect in the state circuit court by June 15 of the year of the forfeiture. *Id*. at 211.78h. Meanwhile, the property owner was provided with various notices of the foreclosure process and of its right to "redeem" the property—meaning the right to remove it from that process—by payment of all the taxes, interest, penalties, and fees due for the property.

If the owner did not redeem, the Act required the state circuit court to enter a foreclosure judgment that vested "absolute title" to the property in the county (or the State, if the county chose not to foreclose), effective March 31 of the following year. M.C.L. § 211.78k(6). The State then had a "right of first refusal" to buy the property for "the minimum bid" (*i.e.*, the amount of the tax delinquency) or "its fair market value." If the State declined, the city or town in which the property was located could purchase the property for merely the "minimum bid." The governmental body that ended up with the property was then free to sell it at a public auction. No matter what the sale price, however, under the Act the property's former owner had no right to any of the proceeds. *See Rafaeli*, 505 Mich. at 448 (noting that the Act "does not

provide for any disbursement of the surplus proceeds to the former property owner, nor does it provide former owners a right to make a claim for these surplus proceeds").

B.

We accept as true the facts alleged in the plaintiffs' complaint. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382–83 (6th Cir. 2016). In February 2018, per the Michigan Act as described above, Oakland County foreclosed on the home of Tawanda Hall to collect a tax delinquency (meaning, as used here, the outstanding taxes, interest, penalties, and fees) of $22,642; the County then conveyed the property to the City of Southfield for that same amount. The City in turn conveyed the property for $1 to a for-profit entity, the Southfield Neighborhood Revitalization Initiative, which later sold it for $308,000. Pursuant to that same process, in February 2016, the County foreclosed on the home of Curtis and Coretha Lee for a tax delinquency of $30,547; after the same series of conveyances, the Southfield Neighborhood Revitalization Initiative sold it for $155,000. The County likewise foreclosed on the home of Kristina Govan for a tax delinquency of $43,350; the Initiative (after the same conveyances) still holds title to the property.

In August 2020, Hall, the Lees, and Govan ("the plaintiffs") brought suit under 42 U.S.C. § 1983 against Oakland County, the City of Southfield, the Initiative, and certain officers of each. The plaintiffs asserted claims under the Takings Clause of the Fifth Amendment (as applied to the states pursuant to the Fourteenth), along with various other federal and state claims. The district court dismissed the plaintiffs' complaint for failure to state a claim. This appeal followed.

II.

We review de novo the district court's dismissal of the plaintiffs' claims. *Osborne v. Metro. Gov't of Nashville*, 935 F.3d 521, 523 (6th Cir. 2019).

A.

1.

The Fifth Amendment's Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The plaintiffs argue that Oakland County did precisely that when it took "absolute title" to their homes as payment for tax delinquencies that amounted to a mere fraction of their homes' values. Specifically, they argue that they each had a vested property right in what is ordinarily called the equity in one's home—meaning the property's value beyond any liens or other encumbrances upon it.

The district court, for its part, disagreed in a carefully reasoned opinion. Specifically, the court held that, in the event of foreclosure, the former property owner has a property right only to any surplus proceeds (meaning proceeds in excess of the tax delinquency) obtained by the "foreclosing governmental unit" after a foreclosure sale—if in fact there was one. For that proposition the court relied upon the Michigan Supreme Court's opinion in *Rafaeli*, which arguably said as much, albeit in dictum. *See* 505 Mich. at 462. And here the foreclosing governmental unit—the County—had not obtained any surplus at all from its disposition of the plaintiffs' homes, because it conveyed them (to the City of Southfield) for merely the amounts of their tax delinquencies.

Where we respectfully disagree with the district court, however, is in its assumption that the question whether the County took the plaintiffs' property is answered solely by reference to Michigan law. True, the federal "Constitution protects rather than creates property interests," which means that "the existence of a property interest," for purposes of whether one was taken, "is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998) (quotation marks omitted). But the Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take. To the contrary, rather, "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law." *Id*. at 167.

The Supreme Court applied that rule in *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980), where a Florida statute allowed a county to keep, as its own, the interest generated on private principal deposited in certain "interpleader" funds held by county courts. The Florida Supreme Court—much like the Michigan Supreme Court here, in the district court's view—had held, based upon the applicable statute, that retention of such interest did not take any property of the persons who had deposited the principal that generated it.  The U.S. Supreme Court stated—on the strength of decisions by two federal circuit courts and three state courts— that "[t]he usual and general rule is that any interest on interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Id*. at 162.  The Court brushed aside the Florida court's reasoning that the private principal in such funds "assumes temporarily the status of 'public money'"; rather, the U.S. Supreme Court held, "the exaction is a forced contribution to the general governmental revenues[.]" *Id*. at 163.  The Court specified that "a State, by *ipse dixit*, may not transform private property into public property without compensation." *Id*. at 164.  Florida had done that, by recharacterizing private principal as public; and hence the county's retention of interest from that principal was a taking without just compensation. *Id*. at 164-65.

The Court applied the same reasoning in *Phillips*, where a Texas State Bar rule likewise treated, as publicly owned, any interest generated from private principal deposited in certain trust accounts.   The Court reasoned that the same "interest follows principal" rule had "been established under English common law since at least the mid-1700s" and had "become firmly embedded in the common law of various states."  524 U.S. at 165.  Hence in that case too the state had disavowed "traditional property interests" by *ipse dixit*; and thus the interest generated by those accounts remained the "private property" of the owners of the principal, notwithstanding the Texas rule to the contrary. *Id*. at 172.

2.

The question, then, is whether Michigan likewise disavowed traditional property interests merely by defining them away in its General Property Tax Act.  The interest that the plaintiffs invoke here, again, is an entitlement to the equity in their homes—pursuant to principles long articulated by courts of equity, before their merger centuries later with courts of law.

a.

In Anglo-American legal history, the rules governing equitable interests in real property arose primarily in the context of what we now call mortgages. In the 12th century, when Glanville wrote down the law of his day, a "gage"—French for "pledge"—was property handed over to a lender as security for a loan. Glenn, 1 *Mortgages, Deeds of Trust, and Other Security Devices as to Land* at 3 (1943). A "mort gage"—meaning a "dead pledge"—took the form of a conveyance. Specifically, the borrower (the mortgagor) would typically grant the lender (the mortgagee) a fee simple interest in land, with provision for reconveyance of the land back to the borrower upon full payment of the amount owed, on a specific date—known as the "law day." In courts of law these agreements were strictly construed: writing in the 1470s, Littleton said that, if the borrower failed for any reason to repay the full amount due on the law day, "then the land which is put in pledge is taken from him forever, and so dead to him[.]" 1 Edward Coke, *Institutes of the Laws of England*, 205a (1628).

But irrevocable forfeiture of the debtor's entire interest in the land, no matter what the reason for the borrower's failure to pay on the law day—for example if, on that day, the lender was nowhere to be found—was before long regarded as an intolerably harsh sanction for the borrower's default. And meanwhile, by the year 1500, as Maitland observed, "we must reckon the Court of Chancery as one of the established courts of justice, and it has an equitable jurisdiction; beside the common law there is growing up another mass of rules which is contrasted with the common law and which is known as equity." Maitland, *The Constitutional History of England* 225 (1908). The ground upon which equitable jurisdiction arose was "that a wrong is done, for which there is no plain, adequate, and complete remedy at the Courts of Common Law." Story, *Commentaries on Equity Jurisprudence* 53 (1836).

The Court of Chancery soon interposed to assuage the harshness of enforcement of mortgages in courts of law. In equity (as a leading American court put it later) courts looked through the form of a contract to its substance. *Lansing v. Goelet*, 9 Cow. 346 (N.Y. 1827). And by 1625 the Court of Chancery saw that, while a mortgage agreement took the form of a conveyance in fee simple, it was in substance "but a Security[.]" *Emanuel College v. Evans*, 21 Eng. Rep. 494, 494–95 (1625). A security was merely personal property, leaving the

mortgagor (*i.e.*, the borrower) with an equitable interest in the land. To vindicate that interest, the Court of Chancery recognized the mortgagor's "Equity of Redemption[,]" which allowed him to regain legal title to the land by repayment of the amount due even after the law day. *Dutchess of Hamilton v. Countess of Dirlton and Lord Cranborne*, 21 Eng. Rep. 539 (1654). In 1678 Lord Hale called the mortgagor's interest "a title in equity." *Pawlett v. Attorney General*, 145 Eng. Rep. 550, 551 (1678). Sixty years later the Chancery Court clarified matters further, by stating expressly that a "mortgage in fee"—the lender's interest in the land—"is considered as personal assets[,]" meaning personal property. *Casborne v. Scarfe*, 26 Eng. Rep. 377, 379 (1737) That court further observed that "[t]he interest of the land"—meaning the interest in real property—"must be some where, and cannot be in abeyance; but it is not in the mortgagee [the lender], and therefore must remain in the mortgagor [the landowner]." *Id*. "Thus the courts conceived the mortgagee's right as a right to money rather than land." Sugarman & Warrington, *Land Law, Citizenship, and the Invention of "Englishness"*, in *Early Modern Conceptions of Property* 111, 120 (1995).

By 1759, Lord Mansfield—among English jurists, exceeded in eminence perhaps only by Coke and Hale—would say that the mortgagor's "equity of redemption is the fee simple in the land." *Burgess v. Wheate*, 28 Eng. Rep. 652, 670 (1759). Hence the mortgagor's "equity to redeem" had itself become "a right of property." 6 Holdsworth, *A History of English Law* 663 (1924). The mortgagor "had an equitable estate in the land; and subject to the legal rights of the mortgagee, was, in equity, regarded as its owner." *Id*. And this equitable estate—which, following Hale, the courts would later call "equitable title"—could be devised or conveyed like any other interest in property. *Casborne*, 26 Eng. Rep. at 379.

b.

Yet the Court of Chancery also recognized, at least nominally, the lender's right to foreclose upon the land. At some point after the law day—when the lender thought he had waited long enough without payment of the amount due—the lender could petition the Court of Chancery for a decree providing that the delinquent landowner "do from this point stand absolutely debarred and foreclosed of and from all right, title, interest and equity of redemption of, in, and to the said mortgaged premises." Glenn, 1 *Mortgages* at 402. This process was

known as "strict foreclosure," since it would extinguish the landowner's equitable interest in the property and grant the lender full ownership of land whose value might far exceed the amount of the unpaid debt. *Id*. at 397; *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994) ("This remedy was called strict foreclosure because the borrower's entire interest in the property was forfeited, regardless of any accumulated equity").

The English courts resisted strict foreclosure for the same reasons they recognized the landowner's equity of redemption. Indeed, the Court of Chancery would refuse to enforce even a landowner's separate agreement (executed at the time of the mortgage) not to assert a right of redemption later. As the court said in *Newcomb v. Bonham*, "once a mortgage always a mortgage"—meaning that, as a practical matter, the lender could not convert his security interest as mortgagee into fee-simple title to the land. 23 Eng. Rep. 266, 267 (1681). And even when the Court of Chancery granted a decree of strict foreclosure, it remained open to vacatur years later if the landowner filed a petition to that effect. Glenn, 1 *Mortgages* at 403. Thus, in English courts of equity, the lender's right to foreclose upon the land was nearly always honored in the breach. As Joseph Story put it later: the "Courts of Equity constantly allow a redemption, although there is a forfeiture at law." Story, *Commentaries on Equity Jurisprudence* at 106.

c.

By the end of the 18th century American courts of equity had begun to address these issues for themselves. The American courts were uniformly hostile to strict foreclosure in cases—like this one—where the land's value exceeded the amount of the debt. New York's highest court in equity, for example, opined that, in cases where "the mortgaged premises exceed the amount of the debt in value," strict foreclosure would be "unconscionable[.]" *Lansing v. Goelet*, 9 Cow. 346, 355, 1827 WL 2536 (N.Y. 1827). Joseph Story likewise recognized the "unconscionableness" of "taking the land for the money." Story, *Commentaries on Equity Jurisprudence* at 106 n.2. In another case the court opined that "strict foreclosure" had "no appropriate place in a system of laws and jurisprudence where . . . the mortgage does not operate as a conveyance of the legal title," but is only "a lien upon the land as security for the debt or other obligation of the mortgagor." *Moulton v. Cornish*, 138 N.Y. 133, 141 (1893).

Yet the American courts—more so than the English courts of the time—recognized a creditor's right to "have the full effect of his securities." *Lansing*, 9 Cow. at 353. That "full effect," however, did not entitle the creditor to recover more than the amount owed. Magna Charta itself had provided that a debtor's lands could be taken only to the extent necessary to satisfy the debt. Magna Charta ¶ 26 (1215); *see also Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 277 (1855). As Justice Scalia later explained, American courts reconciled these competing interests "with the development of foreclosure by *sale* (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure." *Resolution Trust Corp.*, 511 U.S. at 541 (emphasis added).

The innovation of foreclosure by sale exemplified the ability of courts of equity to craft an appropriate remedy where courts of law could not. The New York court in *Lansing* explained—as a matter of judicial power in equity, irrespective of any statute—that "the court may, when equity requires it, interpose at the instance of the mortgagor to direct a sale, when the estate is of greater value than the debt, in order to prevent a strict foreclosure to his prejudice[.]" 9 Cow. at 355. Only by *that* means, rather than by strict foreclosure, could the landowner's equitable interest in the property be extinguished. The land was after all "a resource" for payment of the debt; a "public sale [was] the truest test of the value" of the landowner's equitable interest in the land; and thus a sale was "the best mode of disposing of the property, for the interest of both." *Id*. at 356. If the land was worth at least as much as the debt, its proceeds afforded the lender full payment and thus the "full effect" of his security; and if the land was worth more than the debt, the "surplus" would compensate the landowner for the loss of his equitable interest, as the new buyer took legal and equitable title alike. *Id.* at 353, 356.

For these reasons, by the mid-1800s, foreclosure by sale was "firmly established" in the law of most states, to the exclusion of strict foreclosure. Osborne, *Mortgages* at 661 (1970); *see also, e.g.,* 1 Glenn *Mortgages* at 460; *Clark v. Reyburn*, 75 U.S. 318, 323–24 (1868) (reversing an order of strict foreclosure); *Moulton*, 138 N.Y. at 141 ("strict foreclosure is very rarely resorted to in the American courts"). That was certainly true in Michigan: in 1888 the Michigan Supreme Court observed that "[t]he practice in this State on bills to redeem has long been settled against strict foreclosure in cases of default unless in very peculiar cases. In case the redemption

money is not paid as decreed, the remedy will be by sale as on foreclosure." *Meigs v. McFarlan*, 72 Mich. 194, 201 (1888).

American courts' insistence upon foreclosure by sale, rather than strict foreclosure, extended fully to foreclosures for payment of unpaid taxes. Indeed—given the absence of any agreement by the landowner (as with a mortgage) to forfeit the land upon default—the foreclosure remedy was more limited in tax cases. This limitation was the same one prescribed in Magna Charta, and it underscored the precision upon which the courts insisted whenever land was used to satisfy a debt. In an 1808 case, for example, Chief Justice Marshall held that a tax collector had "unquestionably exceeded his authority" when he had sold more land than "necessary to pay the tax in arrear." *Stead's Ex'rs v. Course*, 8 U.S. 403, 414 (1808); *see also, e.g., Margraff v. Cunningham's Heirs*, 57 Md. 585, 588 (1882) (tax collector's "duty is to sell no more than is reasonably sufficient to pay the taxes and charges thereon, when a division is practicable without injury"); *Loomis v. Pingree*, 43 Me. 299, 311 (Me. 1857) (applying the same rule); *Martin v. Snowden*, 59 Va. 100, 118–19, 139 (1868) (same).

Likewise well-settled by the mid-1800s, and indeed earlier, was the specific property interest retained by a landowner when land served as security for a debt. That interest was what Lord Hale had said it was, namely equitable title; and that interest was an interest in property like any other. In 1843 the Supreme Court nicely summarized the creditor and debtor's respective property interests when land served as security for a debt, particularly in the instance of the debtor's default. "*According to the long-settled rules of law and equity in all the states whose jurisprudence has been modelled upon the common law*," the Court wrote, "legal title to the premises in question vested" in the creditor upon the debtor's default; yet the landowner still held "equitable title" to the property. *Bronson v. Kinzie*, 42 U.S. 311, 318 (1843) (emphasis added). To "extinguish the equitable title of the" debtor, the creditor was required "to go into the Court of Chancery and obtain its order for the sale of the whole mortgaged property (if the whole is necessary,) free and discharged from the equitable interest of the" debtor. *Id*. at 318–19. The sale, moreover, was required to be a public one. *See* Thomas M. Cooley, *A Treatise on the Law of Taxation, Including the Law of Local Assessments*, 489 (1886). Under those same long-settled principles, the debtor would then be entitled to any surplus proceeds from the sale, which

represented the value of the equitable title thus extinguished. *See Resolution Trust Corp.*, 511 U.S. at 541.

3.

Michigan law flatly contravened all these long-settled principles when it allowed Oakland County to take "absolute title" to the plaintiffs' homes as payment for their tax delinquencies. M.C.L. § 211.78k(6). By taking absolute title to the plaintiffs' property, the County took their equitable titles; and the County did so without a public foreclosure sale and without payment to the plaintiffs for the value of those titles. The County's foreclosure of these properties was thus nothing less than a strict foreclosure—a practice that English courts had steadfastly prevented as far back as the 1600s and that American courts (not least Michigan ones) effectively eradicated as "unconscionable" and "draconian" some 200 years ago. *Lansing*, 9 Cow. at 355; *Resolution Trust Corp.*, 511 U.S. at 541. The County took the plaintiffs' equitable titles without paying for them simply because the Michigan General Property Tax Act said it could. Thus—by that *ipse dixit*—the Act "sidestep[ped] the Takings Clause by disavowing traditional property interests long recognized under state law." *Phillips*, 524 U.S. at 167.

That is not to say that Michigan law fails to recognize equitable title in other contexts. To the contrary, Michigan law apparently recognizes equitable title in every context but this one. For example, the Michigan Supreme Court "has consistently held that under a land contract, although the vendor retains legal title until the contractual obligations have been fulfilled, the vendee is given *equitable title, and that equitable title is a present interest in realty* that may be sold, devised, or encumbered." *Graves v. American Acceptance Mortg. Corp.*, 469 Mich. 608, 615 (2004) (emphasis added). The Court further observed "that the legal title remained in the vendor as a trust, and that his only equitable claim upon it was by way of security for his debt in the nature of a vendor's lien, which could only be made effective to devest the vendee's equitable title by a sale through proceedings to foreclose the vendor's lien." *Id*. As described by the Michigan Supreme Court in 2004, therefore, the process for divesting a property owner of equitable title was no different than the process the U.S. Supreme Court had described in *Bronson* 161 years before. Moreover, Michigan law requires private lenders to use that same

process when foreclosing on real property.  *See, e.g., In re $55,336.17 Surplus Funds*, 319 Mich. App. 501, 508-09 (2017).

Meanwhile, Michigan law also recognizes equitable title in timber and mineral rights. *See City of Marquette v. Michigan Iron & Land Co.*, 132 Mich. 130, 132, 92 N.W. 934, 934 (1903) (timber); *Kerzka v. Farr*, No. 310938, 2013 WL 4823507, at *5 (Mich. Ct. App. Sept. 10, 2013) (mineral rights) (citing *Stevens Mineral Co. v. Michigan*, 418 N.W.2d 130, 133 (Mich. Ct. App. Dec. 7, 1987)).  And our court has stated—in an opinion by Judge Ryan, who was himself a former justice of the Michigan Supreme Court—that the value of a land-contract vendee's "equitable title[,]" under Michigan law, "is measured by reducing the fair market value of the property by the amount due on the land contract and any liens," such as "local tax liens." *Cardinal v. United States*, 26 F.3d 48, 49 (6th Cir. 1994).  Michigan law also recognizes the value of equitable title when distributing marital assets in a divorce proceeding. *See, e.g., Reeves v. Reeves*, 226 Mich. App. 490, 493, 575 N.W.2d 1, 2 (1997).  The only context in which Michigan law does not recognize equitable title as a property interest in land, apparently, is when the government itself decides to take it.

The defendants, for their part, insist throughout their briefing that, under Michigan law, a homeowner's equitable interest in her property is limited to any "surplus" proceeds after a foreclosure sale conducted by the "foreclosing governmental unit." *See Rafaeli* 505 Mich. at 462. (Of which there were none here, because there was no public foreclosure sale.)  But that proposition, as shown above, overlooks the very reasons *why* a property owner has a right to the surplus.  That right does not arise in manner akin to quantum mechanics, materializing suddenly without any apparent connection to anything that existed before.  The owner's right to a surplus after a foreclosure sale instead follows directly from her possession of equitable title before the sale.  The surplus is merely the embodiment in money of the value of that equitable title.

The defendants are likewise mistaken in their reliance on *Nelson v. City of New York*, 352 U.S. 103 (1956).  That case hardly disavowed more than two centuries of Anglo-American property law; the case was about process, not substantive property rights.  There, because of a bookkeeper's malfeasance, the property owner had failed to pay its water bills, giving rise to a tax lien.  The City began foreclosure proceeds in which—under the applicable New York

statute—the owner could have triggered a public foreclosure sale simply by asking for one, after which the owner would have been entitled to the surplus proceeds. *Id*. at 110. (The owner alternatively could have redeemed the property simply by paying the overdue bills.) Yet, because of the same bookkeeper's malfeasance, the owner did nothing—with the result that, under the same statute, the owner was "foreclosed of all his right, title, and interest and equity in and to the delinquent property." *Id*. at 104. After the foreclosure decree became final, the plaintiffs sought to unwind it; but the state courts denied relief. The Supreme Court held that "nothing in the Federal Constitution prevents this where the record shows that adequate steps were taken to notify the owners of the charges due and the foreclosure proceedings." *Id*. at 110. In *Nelson* the plaintiffs' problem was not that they lacked equitable title; the New York statute itself recognized their "equity" in the property. *Id*. at 104 n.1. The express basis for the decision in *Nelson*, rather, was that the plaintiffs had not taken any "timely action" to force a public foreclosure sale and "to recover[] any surplus," even though the New York statute expressly gave them opportunity to do so. *Id*. at 110. Here, by contrast, the Michigan General Property Tax Act gave the plaintiffs no such opportunity at all.

As to the plaintiffs' taking claim in Count I of their complaint, two details remain. The first is which of the many defendants in this case effected a taking of the plaintiffs' property. "[T]he act of taking is the event which gives rise to the claim for compensation." *Knick v. Township of Scott*, 139 S.Ct. 2162, 2170 (2019) (cleaned up). Here, that event was the County's taking of "absolute title" to the plaintiffs' homes. Before that event, the plaintiffs held equitable title; after it, they held no title at all. Thus, so far as the Takings Clause is concerned, the County alone is responsible for the taking of the plaintiffs' property.

Second, the Michigan Attorney General, as an intervenor, warns about the "serious fiscal consequences" of a decision in the plaintiffs' favor here. But in this case we sit as a court of law, not equity; and meanwhile the equities run very much the other way. The County forcibly took property worth vastly more than the debts these plaintiffs owed, and failed to refund any of the difference. "In some legal precincts that sort of behavior is called theft." *Wayside Church v. Van Buren County*, 847 F.3d 812, 823 (6th Cir. 2017) (dissenting opinion). And meanwhile the Takings Clause bars the "Government from forcing some people alone to bear public burdens

which, in all fairness and justice, should be borne by the public as a whole." *Webb's Fabulous Pharmacies, Inc.*, 449 U.S. at 163. The plaintiffs have patently been forced to bear such burdens here.

In sum, the Takings Clause "is addressed to every sort of interest the citizen may possess." *U.S. v. General Motors Corp.*, 323 U.S. 373, 378 (1945). The plaintiffs' equitable title to their homes was such an interest. On the facts alleged here, the County took the plaintiffs' property without just compensation, in violation of the Takings Clause.

B.

We briefly address the district court's dismissal of the plaintiffs' other claims. The dismissal of the plaintiffs' inverse-condemnation claim (Count II) was proper because the County has already taken title to their properties. *See Knick*, 139 S. Ct. at 2168. Given our decision as to the plaintiffs' takings claim under the U.S. Constitution, however, we vacate the district court's dismissal of their takings claim under the Michigan Constitution (Count III), and remand that claim with instructions for the district court to abstain from adjudicating it. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500–01 (1941). Whether the facts alleged here violate the Michigan Constitution's Takings Clause is an issue for the Michigan courts to decide. Finally, for substantially the reasons stated by the district court, we affirm the dismissal of Plaintiffs' claims in Counts IV (Eighth Amendment, Excessive Fines violation), V (Procedural Due Process), VI (Substantive Due Process), and VII (Unjust Enrichment).

\* \* \*

We reverse the district court's dismissal of the plaintiffs' takings claim under the U.S. Constitution (Count I) against Oakland County, and remand for proceedings consistent with this opinion. The district court's judgment is otherwise affirmed as to plaintiffs Hall, the Lees, and Govan.